IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

_____
                                    )
GORDON KNOWLES,                     )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )  Civ. No. 16-00678 ACK-KSC
                                    )
HAWAI'I PACIFIC UNIVERSITY          )
                                    )
                    Defendant.      )
_____)


## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I AND DISMISSING THE REMAINING, STATE-LAW CLAIMS WITHOUT PREJUDICE

        For the reasons set forth below, the Court GRANTS
Defendant's Motion for Summary Judgment with respect to Claim I
and DISMISSES the remaining state-law claims.

### PROCEDURAL BACKGROUND

        On December 28, 2016, Plaintiff Gordon Knowles
("Plaintiff") filed a Complaint against Hawai'i Pacific
University ("HPU" or "Defendant").  ECF No. 1 ("Compl.").
Defendant filed an Answer ("Ans.") to Plaintiff's Complaint on
February 1, 2017.  ECF. No. 9.

        Plaintiff's Complaint pleads claims arising out of a
series of events that included the termination of his employment
with Defendant.  Plaintiff claims that Defendant (1) engaged in
unlawful retaliation in violation of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e-3; (2) engaged in unlawful

1

retaliation in violation of the Hawai'i Whistleblowers'

Protection Act (HWPA), Haw. Rev. Stat. § 378-62; and (3)

breached the parties' employment contract.  Compl. ¶¶ 24, 26,

28.

Defendant filed the instant Motion for Summary

Judgment ("MSJ"), along with a Concise Statement of Facts

("Def.'s CSF"), on April 11, 2018.  ECF Nos. 44, 45.  On June

19, 2018, Plaintiff filed his Memorandum in Opposition to

Defendant's Motion ("Opp."), along with a Concise Statement of

Facts ("Pl.'s CSF").  ECF Nos. 51, 52.  Exhibits in support of

Plaintiff's Concise Statement of Facts contained unredacted

personal identifiers in violation of Local Rule 100.10.1, and

Plaintiff filed a redacted version of the affected exhibits on

June 20, 2018.  ECF No. 53.  Plaintiff then filed errata to his

Opposition Memorandum on June 22, 2018.  ECF No. 58.  Defendant

filed a Reply on June 26, 2018 ("Reply").  ECF No. 59.

The Court held a hearing on Tuesday, July 10, 2018 at

11:00 a.m. regarding Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

### I.  Plaintiff's Employment

In 1998, Plaintiff was hired by Defendant as an

Adjunct Professor of Sociology.  Pl.'s CSF, Decl. of Gordon

Knowles ("Knowles Decl.") ¶ 2, ECF No. 53.  Plaintiff contends

that Defendant was aware at the time of his hiring that he was

2

also teaching courses at the University of Hawai'i ("UH").
Knowles Decl. ¶ 3. Plaintiff became an assistant professor and
regular faculty member at HPU in 2002. Def.'s CSF Ex. P,
Deposition of Gordon Knowles ("Knowles Dep."), ECF No. 45-20 at
325[1]; Def.'s CSF Ex. 14, Gordon Knowles's Response to Defendant's
First Request for Admissions to Plaintiff ("Knowles Admis.") ¶
2, ECF No. 45-20. Plaintiff was made an associate professor
during the 2007–08 school year. Knowles Dep. Ex. 5, ECF No. 45-
20 at 366–67. At the time of the at-issue events detailed
below, Plaintiff was a member of the United States Army Reserve.
Def.'s CSF, Gordon Knowles's Response to Defendant's First
Request for Answers to Interrogatories to Plaintiff ("Knowles
Interrog."), ECF No. 45-20 at 439.

## II. Outside Teaching

### a. Initial Correspondence

On January 22, 2014, Carlos Juarez, then Chair of the
Department of Social Sciences and Plaintiff's supervisor,
informed Plaintiff via email that "it ha[d] been brought to
[Juarez's] attention" that Plaintiff was teaching courses at
Honolulu Community College ("HCC") and at UH, in violation of
HPU policy and the Faculty Handbook. Def.'s CSF, Decl. of
Carlos Juarez ("Juarez Decl.") ¶ 3, 7, ECF No. 45-2; Def.'s CSF

---

[1] Citations to specific pages are to the "Page ID #" affixed to
each page by this Court's electronic filing system.

Ex. H, ECF No. 45-12 at 247–48; see Knowles Decl. ¶ 4.  In the email exchange that followed, Plaintiff said that he felt Juarez was "targeting [him] again," discriminating against him on the basis of his status as an Army Reservist and veteran, and continually harassing him.  Def.'s CSF Ex. H at 243–46; see Juarez Decl. ¶ 8.  Plaintiff stated that he suffered from PTSD and accused Juarez of hating him and "looking for a way to fire [him] for quite some time."  Def.'s CSF Ex. H at 243.  In that same exchange, Juarez excerpted the applicable portion of the then-operative, 2004 Faculty Handbook:

> Before accepting outside employment, a faculty member with regular status must write a letter fully disclosing the nature of the employment written to the Vice President of Academic Administration and the President of the University to obtain written approval to engage in such employment.  New faculty members must also inform the Vice President of Academic Administration about whether they are employed or own a business which provides income and, if so, obtain written authorization from the appropriate dean as well as the President to continue such employment while also being employed by the University.  The University has no desire to interfere with outside interests as long as these interests do not interfere with the faculty member's performance or the goals and objectives of the University.  Outside employment or income should not be with an organization that is in direct competition with our University.

Id. at 245–46.

On January 23, 2014, Juarez forwarded the January 22 email exchange to David Lanoue, then Dean of the College of Humanities and Social Sciences at HPU, asking Lanoue to intervene. Def's CSF, Decl. of David Lanoue ("Lanoue Decl.") ¶ 2, 5, ECF No. 45-1; Def.'s CSF Ex. I, ECF No. 45-13 at 250. Lanoue then emailed Plaintiff and requested a meeting with him that afternoon. Lanoue Decl. ¶ 7; Def.'s CSF Ex. B, ECF No. 45-6 at 233. The following day, Plaintiff sent an email to Juarez and Lanoue with the subject line "Overloads and Outside Teaching- Knowles Motivation." Juarez Decl. ¶ 10; Def.'s CSF Ex. J, ECF No. 45-14 at 258. In that email, Plaintiff stated that he engaged in outside teaching in order to fund his research; he also referred to the original source of information regarding his outside teaching as a "stalker" and asked Juarez and Lanoue to consider his motives, as well as those of the "stalker," in "weighing out the consideration of disciplinary action and termination against" him. Def.'s CSF Ex. J at 258.

On January 25, 2014, Lanoue informed Plaintiff via email that "nobody is proposing that [he] be terminated or even disciplined over this"; rather, HPU "simply want[ed] [him] to fill out the necessary paperwork and become familiar with the relevant portions of the [Faculty] [H]andbook." Lanoue Decl. ¶ 8; Def.'s CSF Ex. C, ECF No. 45-7 at 234. In an email dated January 28, Lanoue told Plaintiff that there appeared to be no

"stalker" involved; instead, an employee looking at the HCC catalog "for other reasons" happened to see Plaintiff's name on the teaching roster and informed Juarez, who, in the process of verifying that information, discovered that Plaintiff was teaching for UH as well.  Lanoue Decl. ¶ 9; Def.'s CSF Ex. D, ECF No. 45-8 at 235.

On March 12 or 13, 2014, Juarez and Plaintiff discussed Plaintiff's Professional Development Plan, Juarez Decl. ¶ 12; Def.'s CSF Ex. K, ECF No. 45-15 at 285, together with an addendum that included, <u>inter alia</u>, a comment regarding Plaintiff's outside teaching:

> In light of recent awareness of teaching
> being done at an external competitor
> university, the instructor is reminded that
> any future outside teaching must get pre-
> approval form the dean.  Instructor
> explained that this is being taken up
> directly with HR and that he has retained
> legal counsel to challenge the university's
> policy.

Def.'s CSF Ex. K, ECF No. 45-15 at 289.  Plaintiff (and Juarez) signed both the addendum and the Professional Development Plan. <u>Id.</u>

On April 25, 2014, Juarez emailed Lanoue to inform him that Juarez, "[i]n browsing the online class schedule for [UH], . . . found two forthcoming courses listed for [Plaintiff]", one during the summer and one during the fall.  Juarez Decl. ¶ 13; Def.'s CSF Ex. L, ECF No. 45-16 at 290.

On June 5, 2014, Plaintiff was offered a renewed contract for a "regular faculty" position at HPU. Knowles Dep. at 315; id. Ex. 8, ECF No. 45-20 at 368-371. The contract was "for the period beginning August 16, 2014, and ending August 15, 2019 (the 'Appointment Term')," "subject to the disciplinary, termination, and other provisions of the new 2014 Faculty Handbook." Knowles Dep. Ex. 8 at 368. The contract stated, inter alia:

> By accepting this offer of appointment, you agree to observe and comply with all University rules, regulations and policies, including but not limited to the Faculty Handbook, AAPPM, and Code of Ethical Conduct . . . .
>
> You agree not to engage in any enterprise or activity that may, in the judgment of the University, interfere with the performance of your duties to the University . . . or with the mission of the University and/or its affiliates. You are subject to the University's rules on outside activities and employment, as set forth in the Faculty Handbook and the AAPPM's Conflicts of Interest Policy, as may be amended from time to time.
>
> If the University determines that you have not complied with any University policy or procedure, you may be subject to disciplinary action, up to and including termination of your employment during the Appointment Term.

Id. at 368-70. On or about June 5, 2014, Plaintiff accepted the offered appointment, signing his name below the statement, "I accept employment at Hawai'i Pacific University under the terms

7

and conditions set forth in this letter, the Faculty Handbook, the AAPPM, and the code of Ethical Conduct (as such documents may be amended by the University from time to time)." Id. at 371.

On August 16, 2014, Juarez notified Lanoue via email that Plaintiff was scheduled to teach three courses at UH for the fall 2014 term. Juarez Decl. ¶ 14; Def.'s CSF Ex. M, ECF. No. 45-17 at 296. On August 20, 2014, Lanoue emailed a notice to all faculty reminding them that (1) the 2014 version of the Faculty Handbook became operative on August 15, 2014, and (2) that handbook contained language regarding outside employment, which Lanoue quoted:

> "**Before accepting outside employment, a Regular Faculty member must write a letter fully disclosing the nature of the employment to the Provost/Vice President of Academic Affairs to obtain written approval to engage in such employment.** Prior to accepting a faculty appointment to the Hawai'i Pacific University, new regular faculty members must also inform the Provost/Vice President of Academic Affairs about whether they are employed or own a business which provides income and, if so, obtain written authorization from the Provost/Vice President to continue such employment while also being employed by the University. The University has no desire to interfere with outside interests as long as these interests do not interfere with the faculty member's performance or the goals and objectives of the University. **Outside employment or income should not be full-time nor should it be with an organization that**

> **is in direct competition with our University**." (emphasis mine)
>
> If this applies to you and you have not already done so, please sent [sic] a letter to the Provost right away. In addition, you should be aware that teaching at other Universities may well be considered "employment…with an organization that is in direct competition with our University" and may not receive approval.

Def.'s CSF Ex. E, ECF No. 45-9 at 236–37.

On September 11, 2014, Lanoue emailed Plaintiff to remind him of the conflict of interest policy; noting that Plaintiff "appear[ed] to be scheduled to teach courses for other educational institutions during the fall semester," Lanoue also reminded Plaintiff that he must immediately seek written permission from the Provost, and that that permission might not be forthcoming. Lanoue Decl. ¶ 12; Juarez Decl. ¶ 16; Def.'s CSF Ex. N, ECF No. 45-18 at 300. Plaintiff responded the same day, stating that he had already asked HPU "to cease conducting surveillance of [his] off campus 'life'," that he had filed a police report on the matter, and that his service in the Army Reserves was not a conflict of interest. Lanoue Decl. ¶ 13; Juarez Decl. ¶ 17; Def.'s CSF Ex. O, ECF No. 45-19 at 301. Lanoue informed Plaintiff that his military service was not the topic of the concern, Lanoue Decl. ¶ 14, and elevated the matter to Matthew Liao-Troth, then Provost/Vice President for Academic Affairs, for further review, Def.'s CSF, Declaration of Matthew

Liao-Troth ("Liao-Troth Decl.") ¶ 4, ECF No. 45-3; Lanoue Decl.
¶ 15.

On September 22, 2014, Liao-Troth issued a letter to
Plaintiff directing him to attend a "mandatory meeting" to
discuss the Conflict of Interest Policy, appending a copy of the
Conflict of Interest Policy as laid out in the 2014 Faculty
Handbook. Liao-Troth Decl. ¶ 5; Knowles Dep. at 319; id. Ex.
10, ECF No.45-20 at 419–20.

### b. Meeting and Further Correspondence

On October 13, 2014, Plaintiff met with Liao-Troth and
then Interim Associate Vice President of Human Resources Diana
Niles-Hansen. Liao-Troth Decl. ¶ 6. In that meeting, Plaintiff
produced a written statement equating HPU's investigation of his
outside employment with stalking and making allegations of
workplace violence. Id.; Knowles Dep. at 321. That same day,
Liao-Troth sent a letter to Plaintiff that, inter alia: (1)
reproduced the Conflict of Interest Policy as laid out in the
2014 Faculty Handbook; (2) noted that Plaintiff's teaching at UH
and HCC without written approval constituted a violation of that
policy, which "warrants termination of [Plaintiff's] appointment
and contract"; (3) reiterated that Plaintiff's service in the
Army Reserve did not present a conflict of interest; (4) advised
that the University had investigated Plaintiff's stalking
allegations and found them to be meritless; (5) excused "the

apparent conflict of interest for the Fall 2014 semester with
the understanding that any conflicts will be resolved by January
1, 2015"; and (6) asked Plaintiff to plan on meeting with Liao-
Troth again on January 7, 2015 to verify that there was no
ongoing conflict of interest.  Def.'s CSF, Declaration of Trisha
Gibo ("Gibo Decl.") ¶ 6, ECF No. 45-4; Knowles Dep. at 325;
Knowles Admis. ¶ 38; id. Att. 17, ECF No. 45-21 at 499-500.
Within a day or two of this meeting, Plaintiff filed a petition
for a temporary restraining order ("TRO") and for injunction
against harassment against Liao-Troth, Lanoue, and Niles-Hansen
around the time of this meeting, and that petition was denied.
Knowles Dep. at 322.

The January 7, 2015 meeting was rescheduled for
January 29, 2015, Knowles Admis. ¶ 44; id. Att. 23, ECF No. 45-
21 at 503, and Plaintiff did not attend; neither did he attend a
rescheduled meeting on February 4, Knowles Admis. Att. 23 at
503; Liao-Troth Decl. ¶ 10, 13.  On February 10, Liao-Troth
issued a letter to Plaintiff stating that Plaintiff's failure to
appear at the meetings (or, in the alternative, to submit a
written statement that he was not engaging in full-time work
elsewhere and that he was not teaching at another college or
university) was insubordination, in violation of the Faculty
Handbook and Plaintiff's employment contract.  Liao-Troth Decl.
¶ 14; Knowles Admis. Att. 23 at 503.  The letter directed

Plaintiff to appear at a February 13 meeting and advised him
that failure to appear would be an act of insubordination that,
together with the two prior missed meetings, could lead to
unpaid suspension. Knowles Admis. Att. 23 at 503-04. The
letter also noted that, if Plaintiff did not provide information
about his outside teaching, HPU would rely on the publicly
available information, and that outside teaching was misconduct
that could result in "discipline up through termination." Id.
Plaintiff did not attend the February 13 meeting. Liao-Troth
Decl. ¶ 16.

### c. Suspension and Termination; First EEOC Filing

On or about February 21, 2015, Plaintiff was placed on
unpaid administrative suspension.[2]

Defendant asserts that Plaintiff was notified of HPU's
"intent to pursue a sanction of dismissal under Section IV.I.2
of the Faculty Handbook"[3] on or about March 20, 2015. MSJ at
182. Plaintiff contends that he did not receive any letter
containing this information until April 3, Pl.'s CSF at ¶ 12,
and there is a dispute between the parties regarding which of
two versions of the letter Plaintiff received, id.; Opp. at 586-

---

[2] The record does not contain the letter of suspension, but the
suspension and date thereof are referenced in a letter from
Defendant to Plaintiff dated February 24, 2015. Knowles Admis.
¶ 45; id. Att. 24, ECF No. 45-21 at 519.
[3] Section IV.I.2 of the 2014 Faculty Handbook pertains to
"Dismissal for Cause." Knowles Dep., ECF No. 45-20 at 316-17;
id. Ex. 9, ECF No. 45-21 at 405.

87; Reply Br. at 627–29. Both versions of the letter reference Plaintiff's ongoing conflict of interest and his insubordination in failing to attend multiple mandatory meetings with Liao-Troth.[4] In addition to pointing to Plaintiff's unapproved outside teaching as a conflict of interest in violation of his employment contract and Section VI.A of the Faculty Handbook, both letters iterate that his repeated refusal to meet with Liao-Troth was a violation of Section IV.I.1 of the Faculty Handbook. Knowles Admis. ¶ 46; id. Att. 25, ECF No. 45-21 at 521–22; Knowles Decl. ¶ 12; Pl.'s CSF Ex. 2, ECF No. 53 at 603. Section IV.I.1 of the Faculty Handbook, excerpted in both versions of the letter, notes that discipline up to and including termination may be taken for, inter alia, "[a] pattern of neglect of duty, including . . . the failure to attend faculty or committee meetings" or "[d]isruptive conduct." Knowles Dep. Ex. 9, ECF No. 45-20 at 403–04.

Plaintiff filed a petition for a temporary restraining order ("TRO") and injunction against harassment in the District Court of the First Circuit Honolulu Division on March 23, 2015, alleging that Liao-Troth, Niles-Hansen, and Lanoue were stalking/cyberstalking and harassing him. Knowles Decl. ¶ 10;

---

[4] In one version of the letter, these references are contained in the body, Pl.'s CSF Ex. 2, ECF No. 53 at 602–03; an attachment to the other details the "charges" against Plaintiff, Knowles Admis. ¶ 46; id. Att. 25, ECF No. 45-21 at 520.

Gibo Decl. ¶ 7; Def.'s CSF Ex. R, ECF No. 45-22 at 541–44.  The

TRO was denied on April 6, 2015.  Def.'s CSF Ex. R at 545.

On March 27, 2015, Plaintiff filed a charge with the

Equal Employment Opportunity Commission ("EEOC"), in which he

alleged that his placement on unpaid administrative suspension

was an act of retaliation against him for reporting workplace

violence and that he was discriminated against on the basis of

his Army Reserve status.[5]  Knowles Decl. ¶ 11; Pl.'s CSF Ex. 1,

ECF No. 53 at 597.  He dual-filed the same or a similar charge

with the Hawaiʻi Civil Rights Commission ("HCRC") and with the

EEOC on June 2, 2015.  Knowles Admis. ¶ 5; id. Att. 1, ECF No.

45-21 at 481.  The EEOC dismissed the complaint and issued a

right-to-sue letter on June 10, 2015.  Knowles Decl. ¶ 15;

Knowles Admis. ¶ 7; id. Att. 3, ECF No. 45-21 at 484–85.  The

HCRC dismissed the related complaint on June 19, 2015.  Knowles

Admis. ¶ 8; id. Att. 4, ECF No. 45-21 at 486.  Plaintiff also

filed a Complaint with the United States Department of Labor on

April 29, 2015, alleging that Defendant had discriminated

---

[5] The parties display some uncertainty regarding the date and
nature of this filing.  Defendant asserts that Plaintiff filed
his first EEOC complaint "[A]round 3/30/2015," Def.'s CSF ¶ 46,
ECF No. 45 at 206, and Plaintiff characterizes this filing as a
"Pre-Complaint Questionnaire," Pl.'s CSF ¶ 46, ECF No. 51 at
555.  The March 27, 2015 filing, though styled "Intake
Questionnaire," is in fact a charge of discrimination.  See
Pl.'s CSF Ex. 1, ECF No. 53 at 600 (box checked beside "I want
to file a charge of discrimination").  There is no March 30,
2015 EEOC charge in the record.

against him due to his status as a military veteran.  Knowles
Decl. ¶ 14; Def.'s CSF at ¶ 47.

    On June 19, 2015, Geoffrey Bannister, then President
of the Faculty Assembly Review and Promotion Committee
("FARPC"), issued a letter to Plaintiff informing him that the
period of time during which he could request a formal hearing
regarding disciplinary action before the Dismissal Grievance
Committee had elapsed and noting that Plaintiff had not made
such a request.  Knowles Admis. ¶ 14; id. Att. 8, ECF No. 45-21
at 490.  The letter stated that Plaintiff was dismissed,
effective June 22, 2015, for "(1) engaging in four consecutive
acts of insubordination when [Plaintiff] ignored the Provost's
direct and specific instructions to attend mandatory meetings;
and (2) engaging in an employment conflict of interest in
violation of your regular faculty contract and the Faculty
Handbook." Knowles Admis. Att. 8 at 490.

### d. Events Following Termination

    On August 17, 2015, Plaintiff had an encounter with
Sheryl Sunia, an HPU employee, at a Starbucks.  Knowles Admis. ¶
19; id. Att. 10, ECF No. 45-21 at 496.  Sunia alleged that
Plaintiff told her had just returned from Thailand where he was
studying Muay Thai (Thai boxing).  Knowles Admis. Att. 10 at
496.  Sunia also stated that Plaintiff said, "I am going to see
the Chief and get a concealed weapons permit for those psychos

at HPU." Id. Plaintiff disputes that he made this latter statement. Knowles Decl. ¶ 17. Sunia apparently filed a police report about the incident. Knowles Admis. Att. 10 at 496.

On August 31, 2015, Plaintiff had an encounter with Niles-Hansen on the street. Knowles Admis. Att. 10 at 494. Niles-Hansen alleged that Plaintiff yelled profanities at her, told her to stay away from him, and jeered and gestured aggressively. Id. Plaintiff, in his second EEOC/HCRC complaint, stated that he "loudly informed" Niles-Hansen to stay away from him and that he called her a stalker, Knowles Admis. ¶ 6; id. Att. 2, ECF No. 45-21 at 482, but disputes that he shouted obscenities or aggressively jeered. Knowles Decl. ¶ 18. Niles-Hansen apparently filed a police report about the matter. Knowles Admis. Att. 10 at 494.

On or around September 1, 2015, apparently acting on information provided by Sunia and Niles-Hansen, the Honolulu Police Department arrested Plaintiff and confiscated his firearm(s). Knowles Decl. ¶ 22.

On September 2, 2015, Sunia and Niles-Hansen filed for a TRO and injunction against harassment against Plaintiff. Knowles Admis. Att. 10 at 491–98. This petition was granted. Id. at 493.

On September 4, 2015, Plaintiff filed a second EEOC/HCRC discrimination charge alleging that his termination

and arrest were in retaliation for his initial EEOC charge. Knowles Admis. Att. 2 at 482. The EEOC dismissed the complaint and issued a right-to-sue letter on September 28, 2016. Knowles Admis. ¶ 9; id. Att. 5, ECF No. 45-21 at 487-88. The HCRC dismissed the related complaint on November 23, 2016. Knowles Admis. ¶ 10; id. Att. 6, ECF No. 45-21 at 489.

**STANDARD**

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure ("Rule") 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323). "When the moving party has carried its burden under Rule 56[(a)]

17

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment); Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment").

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor") (internal citation and quotation omitted).

## DISCUSSION

### I. Count I—Title VII Retaliation

Plaintiff appears to claim that his placement on unpaid administrative suspension, his termination, and his September 2015 arrest were all acts of retaliation carried out or (in the case of his arrest) orchestrated by Defendant, in violation of Title VII.  Compl. ¶ 15, 21–24.

Plaintiff's Memorandum in Opposition to the instant motion does not address his Title VII retaliation claim.  See Opp.[6]  By failing to make any argument regarding the claim, Plaintiff has abandoned it.  See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008) (holding that a plaintiff "'abandoned . . . claims by not raising them in opposition to [defendant's] motion for summary judgment,'" quoting Jenkins v. Cty. of Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)).  Having abandoned the claim, Plaintiff has failed to show that there is a genuine issue for trial, and summary judgment in Defendant's favor is therefore proper on Plaintiff's Title VII claim.  See, e.g., Cabell v. Zorro Prod., Inc., No. 5:15-CV-00771-EJD, 2018 WL 2183236, at *17 (N.D. Cal. May 11, 2018); Lewis v. Allstate Ins. Co., No. 3:15-CV-8074-HRH, 2016 WL 5408332, at *4 (D. Ariz.

---

[6] In his Opposition's only gesture at his Title VII retaliation claim, and although his analysis discusses only his HWPA and contract claims, Plaintiff states, in conclusion, that "there are genuine issues of material fact relating to [Plaintiff's] retaliation, HPWA and contract claims." Opp. at 588.

Sept. 28, 2016); Scharf v. Trabucco, No. 3:14-CV-8183-HRH, 2016 WL 3124621, at *1 (D. Ariz. June 3, 2016); Harley v. Cty. of Los Angeles, No. CV10-03481 SJO (VBKx), 2011 WL 13214283, at *10 (C.D. Cal. June 13, 2011).

The same result would attend even if Plaintiff had not abandoned the claim. The Court therefore holds, in the alternative, that summary judgment in Defendant's favor is proper on the merits of Plaintiff's Title VII retaliation claim.

Title VII of the Civil Rights Act of 1964 prohibits, among other things, employer retaliation against employees (including former employees, Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)) for opposing a violation of Title VII, making a charge, or otherwise participating in a Title VII proceeding. See 42 U.S.C. § 2000e-3(a); Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003) ("Protected activity includes the filing of a charge or complaint"). In order to make out a prima facie case of retaliation under Title VII, Plaintiff must establish that he engaged in protected activity, that Defendant took action that was materially adverse to him, and that there was a causal relationship between the two. See Westendorf v. West Coast Contractors of Nevada, Inc., 712 F.3d 417, 422 (9th Cir. 2013) (citing Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006); Bergene v.

Salt River Project Agric. Improvement & Power Dist., 272 F.3d
1136, 1140-41 (9th Cir. 2001)).

If Plaintiff provides sufficient evidence to make out
a prima facie case, the burden shifts to Defendant to
"articulate a legitimate, non-discriminatory reason" for the
materially adverse action.  Manatt v. Bank of America, NA, 339
F.3d 792, 800 (9th Cir. 2003) (citation omitted).  If Defendant
does so, Plaintiff "bears the ultimate burden of demonstrating
that the reason was merely a pretext for a discriminatory
motive." Id. (quoting Ray v. Henderson, 217 F.3d 1234, 1240 (9th
Cir. 2000)).  Plaintiff may establish pretext through either
direct evidence or circumstantial evidence.  Stegall v. Citadel
Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003).  "'Direct
evidence is evidence which, if believed, proves the fact [of
discriminatory animus] without inference or presumption.'" Id.
(quoting Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th
Cir. 1998)).  If Plaintiff relies on circumstantial evidence to
establish pretext, such evidence must be "specific" and
"substantial." Id. (quoting Godwin, 150 F.3d at 1222).  In the
end, "a plaintiff making a retaliation claim under § 2000e-3(a)
must establish that his or her protected activity was a but-for
cause of the alleged adverse employment action"—in other words,
"that the unlawful retaliation would not have occurred in the
absence of the alleged wrongful action or actions of the

employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360, 362 (2013).

### a. Placement on Unpaid Administrative Suspension

Plaintiff was placed on administrative leave before filing either of his EEOC charges.  Knowles Admis. ¶ 45; id. Att. 24 at 519 (referring to suspension as having gone into effect on February 21, 20105); Pl.'s CSF Ex. 1, ECF No. 53 at 597–600 (pre-complaint questionnaire filed on March 27, 2015); Knowles Admis. Att. 1, ECF No. 45-21 at 481 (dual-filed charge filed with both EEOC and HCRC on June 2, 2015); id. Att. 2 at 482 (dual-filed charge filed with both EEOC and HCRC on September 4, 2015).  Therefore, and as Defendant argues, MSJ at 191, Defendant's placement of Plaintiff on unpaid administrative suspension cannot have been in retaliation for the filing of his EEOC charges.

Beyond the bare allegation in his complaint, Plaintiff does not argue that any of his conduct preceding the imposition of his suspension was protected by Title VII; indeed, the Court notes again, and finds rather puzzling, that Plaintiff did not at all address his Title VII claims—which are the basis for this Court's jurisdiction in this matter—in his Opposition to the instant motion.  Insofar as his filings to the EEOC contain allegations of protected conduct, they are unavailing. Plaintiff's EEOC/HCRC filings state that he was retaliated

against for reporting workplace violence and/or stalking.  Pl.'s CSF Ex. 1 at 597–600.  Title VII prohibits employment discrimination against individuals "because of . . . race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and—as relevant here—discrimination (retaliation) against those who oppose or report such practices, § 2000e-3(a). The reporting of workplace violence or stalking is not, however, protected by Title VII.

Because Plaintiff has failed to establish that he engaged in protected conduct prior to his February 2015 suspension, no reasonable factfinder could conclude that he has made out a prima facie case that that suspension was retaliatory in violation of Title VII.  There are therefore no triable issues of material fact regarding whether the suspension was retaliatory, and Defendant is entitled to judgment as a matter of law.

### b. Termination

Plaintiff was terminated following a well-documented course of action that included an ongoing, unexcused employment conflict of interest and repeated refusals to meet with his superiors to discuss the same.  His complaint appears to allege that his termination was an act of retaliation for his filing of his first EEOC charge and thus was in violation of Title VII.

Plaintiff undisputedly engaged in protected conduct when he filed his first EEOC charge on March 27, 2015, and again when he dual-filed the same or a similar charge with the EEOC and HCRC on June 2, 2015. That his termination on June 21, 2015 constituted a materially adverse action is also undisputed. The only remaining issue is causation.

"[C]ausation 'may be inferred from circumstantial evidence, such as the [defendant's] knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory' conduct." Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 869 (9th Cir. 2014) (quoting Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)). But "there is no set time within which acts necessarily support an inference of retaliation"; rather, "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003).

As noted above, Plaintiff filed a charge with the EEOC on March 27; Defendant sent, and Plaintiff received, notice of HPU's intent to pursue his termination sometime between March 20 and April 3, 2015; and Plaintiff was terminated on June 21, 2015. The parties dispute the precise date of the sending and receipt of Defendant's letter communicating its intent to pursue

Plaintiff's termination, and also disagree regarding which of two versions of that letter Plaintiff received. The Court notes these disagreements without resolving them because they are immaterial: That is, even assuming arguendo that the notice of termination post-dated the filing of his second EEOC/HCRC charge, and assuming further that Plaintiff can establish causation (and thus a prima facie case of retaliation), he has failed to raise a genuine issue of material fact regarding pretext.

Defendant's proffered reason for terminating Plaintiff—that Plaintiff repeatedly violated HPU's conflict of interest policy and failed to attend mandatory meetings, thus violating his employment contract—is both legitimate and nondiscriminatory. It is also exhaustively documented in the record. Proceeding without the benefit of Plaintiff's arguments on this score, the Court nevertheless examines Plaintiff's filings and finds that he has failed to produce evidence tending to show that that reason was pretextual.

"Timing, standing alone, may be insufficient to raise a genuine issue with respect to pretext." Stegall, 350 F.3d at 1070. Aside from timing, the only other attack Plaintiff appears to level against Defendant's proffered reason is his assertion that "[t]here were 10–15 other HPU faculty who were also teaching at UH." Knowles Decl. at ¶ 4. Plaintiff provides

no support for this assertion, much less for the more detailed statement that would make the assertion relevant: that there were 10–15 other HPU faculty who were teaching at UH, who were subject to the conflict of interest policy but who had not sought advance written permission for their conflict of interest, who continued to teach at UH despite repeated warnings from HPU, who refused to attend multiple mandatory meetings, and who were not terminated. Plaintiff's contention that there were other HPU faculty who simultaneously taught at UH amounts to a speculative allegation of the sort that does not create a factual dispute for purposes of summary judgment, see Nelson, 83 F.3d at 1081-82, and is neither specific nor substantial, Stegall, 350 F.3d at 1066 (quoting Godwin, 150 F.3d at 1222).

No reasonable factfinder could conclude on the basis of the timing alone that Defendant would not have terminated Plaintiff but for his protected conduct. Absent any other evidence of pretext, the Court will not make Plaintiff's EEOC "complaint tantamount to a 'get out of jail free' card for [an] employee[] engaged in job misconduct." Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000); see also Mitchell v. Superior Court of Cal., 312 F. App'x 893, 895 (9th Cir. 2009) (finding that plaintiff failed to raise a genuine issue of fact regarding pretext where she offered no evidence but timing to rebut employer's legitimate, nondiscriminatory reason). Because

Plaintiff has failed to raise a genuine issue on the matter of pretext, the Defendant is entitled to summary judgment on this issue.

### c. September 2015 Arrest

Again gleaning Plaintiff's contentions from the face of his complaint, the Court surmises that Plaintiff is alleging that his arrest on September 1, 2015 was "a result of charges orchestrated by management employees of HPU" in response to the filing of his first EEOC charge, and thus was an act of retaliation by Defendant in violation of Title VII. See Compl. ¶ 21, 24.

Once more, that Plaintiff's filing of his first EEOC charge was protected conduct is not in dispute. But Defendant does dispute whether the arrest, occurring as it did following Plaintiff's termination, falls within the ambit of Title VII. MSJ at 192; see also Reply Br. at 626 ("no adverse *employment* action was taken") (emphasis in original). Defendant also disputes Plaintiff's characterization of the arrest as having been orchestrated by HPU, MSJ at 193 ("Plaintiff's arrest was the consequence of a police report filed by Ms. Niles-Hansen, *in her individual capacity*") (emphasis in original), and, pointing to the lapse of five months between the filing of the charge and the arrest, asserts that causation is absent, id. at 193–94.

As a threshold matter, the Court notes that "the antiretaliation provision [of Title VII] does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." Burlington Northern & Santa Fe Ry. Co., 548 U.S. at 57. Rather, in order to establish the second prong of his prima facie case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (citations and internal quotation marks omitted). Being arrested as a result of attempting to vindicate Title VII rights certainly might dissuade a reasonable worker from doing so; the Court therefore finds the arrest to have been materially adverse.

But Plaintiff has made absolutely no showing that the arrest was ascribable to or orchestrated by Defendant. The arrest may well have resulted from the police reports made by Sunia and/or Niles-Hansen following their respective encounters with Plaintiff, and Plaintiff attempts to ascribe their actions, and the resulting arrest, to Defendant by affixing the label "management employees" to Sunia and Niles-Hansen. Compl. ¶ 21. But there is no evidence in the record tending to show that either Sunia or Niles-Hansen was Plaintiff's supervisor "with

immediate (or successively higher) authority over" Plaintiff, as would be necessary for the attachment of vicarious liability, Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765 (1998)—in other words, that either was anything more than Plaintiff's coworker.[7] [8]

Although "Title VII's protection against retaliatory discrimination extends to employer liability for co-worker retaliation that rises to the level of an adverse employment action," Fielder v. UAL Corp., 218 F.3d 973, 985 (9th Cir. 2000), vacated on other grounds, 536 U.S. 919 (2002), "employers are not vicariously liable for retaliatory harassment by co-workers; rather, it is only the employer's encouragement or

---

[7] Niles-Hansen was, at least in October 2014, the Interim Associate Vice President of Human Resources. Liao-Troth Decl. at ¶ 6. The Court can locate no legal authority for the proposition that a person in Niles-Hansen's position is a de facto supervisor, and Plaintiff makes no showing that she exercised "immediate (or successively higher) authority over" him. Although Sunia's position at HPU is not clear from the record, the Court notes that, in her application for a TRO against Plaintiff following their public encounter, Sunia stated that Plaintiff "was to be transferred to [her] supervision" prior to his discharge, Knowles Admis. Att. 10 at 496, which to the Court indicates that she had not been his supervisor. Again, Plaintiff makes no factual showing regarding the positions of Sunia and Niles-Hansen.

[8] In light of the United States Supreme Court's ruling that former employees enjoy the protection of Title VII's antiretaliation provision just as current employees do, Robinson, 519 U.S. at 346, the Court finds it appropriate to address the issue of vicarious liability through the lens of Title VII precedents pertaining to the rights of current employees, notwithstanding that Plaintiff had by this time been terminated and the persons in question were then Plaintiff's former coworkers.

29

toleration of such harassment that may constitute an adverse
employment action." Watson v. Las Vegas Valley Water Dist., 268
F. App'x 624, 627 (9th Cir. 2008) (citing Fielder, 218 F.3d at
984); see also Vance v. Ball State Univ., 570 U.S. 421, 424
(2013) (Title VII liability attaches in cases of coworker
harassment only where employer was negligent).  Even assuming
arguendo that Sunia and Niles-Hansen acted improperly in filing
police reports—which the Court is far from allowing—there is no
evidence that Defendant encouraged or condoned their doing so.

     No reasonable factfinder could conclude on the basis
of the record that this arrest was "orchestrated" by HPU through
its employees, either in order to retaliate against Plaintiff
for having filed an EEOC charge or for any other reason.
Because this is so, Defendant is entitled to summary judgment on
this issue.

## II. State-Law Claims

     A district court "may decline to exercise supplemental
jurisdiction" if it "has dismissed all claims over which it has
original jurisdiction" or if related, state-law claims
"substantially predominate[] over the claim or claims over which
the district court has original jurisdiction."  See 28 U.S.C. §
1367(c)(2), (3).  The United States Supreme Court has noted that
"in the usual case in which all federal-law claims are
eliminated before trial, the balance of factors to be considered

under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988), superseded on other grounds by statute as recognized in Fent v. Okla. Water Res. Bd., 235 F.3d 553, 557 (10th Cir. 2000). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

As is relevant here, the Court finds nothing unusual in this case, and thus no cause to deviate from the usual course of action. None of the factors to be considered counsels to the contrary. The Court has not yet expended significant resources on the pendent state-law claims; the parties both reside in Honolulu, where state court is a stone's throw from federal court, and so litigation in the proper forum will not be inconvenient; and, regarding fairness, the Court notes that the clock was paused on any applicable statutes of limitations during the pendency of this litigation, and will remain paused for 30 days after the dismissal of the state-law claims. Artis v. District of Columbia, 138 S. Ct. 594, 598 (2018). Comity, of course, counsels against the exercise of federal jurisdiction here. Plaintiff's state-law claims are matters for state

courts—and, given Plaintiff's abandonment of and evident inattention to his federal claim, the Court wonders why he did not proceed to state court in the first instance.

Because judicial economy, convenience, fairness, and comity weigh in favor of declining jurisdiction over Plaintiff's state-law (HWPA and breach of contract) claims, the Court declines to exercise supplemental jurisdiction over those claims.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment as to Count I. Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims (Counts II and III) and DISMISSES these claims without prejudice to Plaintiff filing in Hawai'i state court.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, July 10, 2018.



Alan C. Kay
Sr. United States District Judge

Knowles v. Hawai'i Pacific Univ., Civ. No. 16-00678 ACK-KSC, Order Granting Defendant's Motion for Summary Judgment as to Count I and Dismissing the Remaining, State-Law Claims Without Prejudice